1
2
3
4
5
6
7
8
9
10
11
12
13
14

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

ANDRE RAMON WASHINGTON,

    *Petitioner*,

vs.

BILL DONAT, *et al.*,

    *Respondents.*

3:06-cv-00705-ECR-VPC

ORDER

15      This habeas matter under 28 U.S.C. § 2254 comes before the Court for a decision on
16 the merits on the claims remaining before the Court.

17                             ***Background***

18      Petitioner Andre Washington seeks to set aside two 2003 Nevada state judgments of
19 conviction, each pursuant to a guilty plea.  The charges arose from a November 4, 2001,
20 armed robbery at a Jack in the Box restaurant in Reno, Nevada and a November 14, 2001,
21 armed robbery at an Auto Zone store in Reno.  In the Jack in the Box case, Washington pled
22 guilty to robbery with the use of a firearm.  In the Auto Zone case, he pled guilty to robbery
23 with the use of a firearm and conspiracy to commit robbery.

24      In the claims remaining before the Court in Ground 3, petitioner alleges that he was
25 denied effective assistance of counsel when defense counsel allegedly failed to investigate
26 an alibi defense prior to his plea in the two cases.  In the remaining claims in Ground 11,
27 petitioner alleges that he was denied effective assistance of counsel when defense counsel
28 failed to present additional mitigating evidence at sentencing.

1    Washington was charged in the two cases along with co-defendants Anthony Lamont

2   Nobles and Kevin Lewis.  The state trial court ultimately ruled that the Jack in the Box charges

3   would be tried separately from the Auto Zone charges, after Nobles opted to plead guilty in

4   the Auto Zone case with no plea bargain.[1]

5    Evidence presented at pretrial hearings reflects that the State's evidence in the Jack

6   in the Box case included the following.[2]

7    Employee Miroslava Moreno, employee Ivone Lopez, customer Michael Mello, and

8   Detective Ron Chalmers testified with regard to the Jack in the Box offenses.

9    On the morning of November 4, 2001, two black males came into the Jack in the Box,

10   one dressed predominately in blue and the other in black.  They left after only a short time.

11   About fifteen minutes later, the two males returned with a third male.  The original two males

12   went to the counter, and the third male eventually went towards the only customer in the

13   restaurant, Michael Mello.[3]

14    At the counter, the male dressed in blue jumped over the counter, pulled Moreno

15   toward him, pointed a handgun at her back, and told her to open the cash register.  The gun

16   was silver-colored and was "really little," small enough that the robber's hands covered

17   everything but the barrel.[4]

18    After seeing the small amount of money in the register, the robber in blue asked

19   Moreno who the manager was.  She pointed to Lopez.  The robber let go of Moreno and told

20   Lopez to open the safe.  Lopez did not know the combination, but a third employee, Jessica

21

22    [1]See,e.g., #26, Ex. 77, at 6-9; #26-7, Ex. 77 (cont.), at 225 & 228-31; #26-9, Ex. 83, at 4-5; #27, Ex.

23   87, at 5-7.

24    [2]The Court makes no credibility findings or other factual findings regarding the truth or falsity of

25   evidence or statements of fact in the state court.  The Court summarizes same solely as background to the
     issues presented in this case, and it does not summarize all such material.  No statement of fact made in
     describing statements, testimony or other evidence in the state court constitutes a finding of fact by this

26   Court.

27    [3]## 25-1 & 25-2, Ex. 49, at 7-10 & 19-22 (Moreno); #25-2, Ex. 49, at 30-33 (Mello).

28    [4]## 25-1 & 25-2, Ex. 49, at 10-12, 16-17 & 21-22(Moreno).

Garcia or Yessica Garfias, did.  The robber in blue took Lopez and Garcia into the office where the safe was.  The male in black stayed at the counter holding a gun on Moreno and told her, *inter alia*, to not try and press any alarm.[5]

Meanwhile, the third male approached Mello at the far end of the restaurant.  The male slammed his body into Mello's body, pushing him into the corner of the booth and knocking the breath out of him.  The male asked:  "What you got for me?"  The male took Mello's conceal-carry handgun and then his wallet, saying, *inter alia*: "I ought to shoot you with your own gun."  Mello did not see that the male had a gun before the male took his gun.[6]

After getting the money from the safe, the robber in blue came out from the office, jumped back over the counter, and the three men left.[7]

The investigating detective prepared a separate photographic lineup for each of the three defendants after they were apprehended in connection with the Auto Zone robbery, which is discussed further below.[8]

Washington and the two other co-defendants matched the physical descriptions given by the witnesses from the Jack in the Box incident.[9]

Mello identified Washington and one of the other co-defendants from separate photographic lineups on November 21, 2001, but he identified another individual in the third lineup containing the third co-defendant's picture.  Mello was fifty to sixty percent sure as to his identification of Washington, while he was eighty percent sure of his identification of the individual who was not a suspect.  At the preliminary hearing he identified the three

---

[5]## 25-1 & 25-2, Ex. 49, at 17 & 19-24 (Moreno); #25-2, Ex. 49, at 25-27 (Lopez); #25-2, Ex. 49, at 34-36 & 42-43 (Mello).  Garcia or Garfias was killed in a vehicular accident before the preliminary hearing. #25-3, Ex. 49, at 53 (Chalmers); #26-6, Ex. 77, at 198 (same).

[6]#25-1, Ex. 49, at 17-19 (Moreno); #25-2, Ex. 49, at 33-34 & 46 (Mello).

[7]## 25-1 & 25-2, Ex. 49, at 17 & 24 (Moreno); #25-2, Ex. 49, at 27 (Lopez); #25-2, Ex. 49, at 33 (Mello).

[8]## 25-2 & 25-3, Ex. 49, at 47-52 (Chalmers); #26-6, Ex. 77, at 193-94 (same); #26-7, Ex. 77 at 210-13 (same).

[9]#26-6, Ex. 77, at 191-93 & 200-01 (Chalmers).

defendants as the robbers by name, without prompting, including identifying Washington as the individual who robbed him.  Mello testified that he learned the names of the defendants when they all were in court at a prior setting of the preliminary hearing.  He affirmed on redirect that he identified the defendants at the preliminary hearing by his own recollection. He agreed on recross, however, that he was sure of his in-court identification as opposed to his only qualified certainty in the photo line-up "based upon seeing them in the courtroom."[10]

Lopez was not able to identify any of the three defendants in the photo lineups.  At the preliminary hearing, Moreno was able to identify Nobles as the robber wearing black, but she was not able to identify either Lewis or Washington as one of the remaining two robbers.  At the preliminary hearing, Lopez appeared to identify Washington as the robber in blue, saying that the robber in blue "seems like the gentleman in the center" at counsel table, which was where Washington was seated.  Lopez and Moreno, like Mello, also had previously observed the three co-defendants when they were brought in together for a prior setting of the preliminary hearing.[11]

Evidence presented at pretrial hearings further reflects that the State's evidence in the Auto Zone case included the following.

Employees Jim Martinez, Ronald Scheiwiller, and Dan Traut testified regarding the Auto Zone incident.

On the morning of November 14, 2001, an individual who Martinez identified in court as Nobles called him over and inquired about car batteries.  While Martinez was responding, Nobles told him that it was a robbery and instructed him to take him to the safe.  Martinez saw that Nobles was holding a small caliber black semiautomatic handgun against his own body.[12]

/ / / /

---

[10]#25-2, Ex. 49, at 31-36, 38-41 & 44-46 (Mello); #25-3, Ex. 49, at 51-57 & 65 (Detective Chalmers); #26-6, Ex. 77, at 194-97 & 203-08 (same); #26-7, Ex. 77, at 216-21 (same).

[11]## 25-1 & 25-2, Ex. 49, at 8-10 & 20-21 (Moreno); #25-2, Ex. 49, at 26-29 (Lopez); #26-6, Ex. 77 at 195 & 197-98 (Chalmers).

[12]#24-3, Ex. 37, at 6-12 & 21-24 (Martinez).

1    Martinez and Nobles went behind the counter and toward the back to where the safe
2    was located.  On their way to the back, they passed Traut who was in the back looking for a
3    part for a customer.  As Martinez and Nobles entered the office where the safe was,
4    Scheiwiller was in the office on the phone.  Scheiwiller also identified the armed robber with
5    Martinez as Nobles.  Scheiwiller recalled that Nobles was wearing a dark blue baseball cap
6    with a Yankees logo.  He testified that the gun that Nobles was holding was a dark "more of
7    a carbon" color rather than chrome in color and was small caliber.[13]

8    Meanwhile, Traut returned to the counter.  He rang up a different customer for items
9    that included some adhesive weather stripping and adhesive.  Traut rang up the items and
10   bagged them, and he was making change from the bill that the customer used to pay for
11   them.  At this point, the customer told Traut: "Put it in the bag."  Traut at first thought that the
12   customer meant his change, but the customer told him: "No, put it in the bag."  Traut then
13   figured that it was a robbery.  He gave the robber approximately $160.00 from his register,
14   including rolled change wrapped in Peppermill coin wrappers.[14]

15   Traut identified Washington at the hearing as the individual who robbed him.  Traut did
16   not see a gun, but Washington was holding his hands in his pockets as if to make it look like
17   he had a gun.  Traut thought that Washington did have a gun.[15]

18   Back in the office at the safe, Nobles instructed Martinez to empty all of the money out
19   of the safe, and Martinez complied.  He placed the money, including rolled and loose change,
20   in a plastic shopping bag that was not an Auto Zone shopping bag but instead was from
21   another store.[16]

22   ////

23

24   [13]#24-3, Ex. 37, at 12, 14 & 18-19 (Martinez); #24-4, Ex. 37, at 34-38, 41-42 & 47-53 (Scheiwiller);
25   #26-3, Ex. 77, at 120 (Traut); #26-4, Ex. 77, at 127-28 (same).

26   [14]#26-3, Ex. 77, at 118-20 (Traut); #26-4, Ex. 77, at 121-29 (same).

27   [15]#26-4, Ex. 77, at 121-24 (Traut).

28   [16]#24-3, Ex. 37, at 12-14 & 24-25 (Martinez); #24-4, Ex. 37, at 44-45 (Scheiwiller).

Out front at the counter, Washington told Traut to open the second cash register. Traut said that he could not, and he told him that someone from the back would have to do it. Washington took Traut to the back, where Traut saw the first robber at the safe with Martinez and Schieweller.[17]

Both Martinez and Scheiwiller identified Washington as the second robber who came to the back. There was a lock box in the safe. Accordingly to Martinez' testimony, Washington came back to the office and asked about the lock box. Martinez and Scheiwiller told Washington that the lock box could be opened only by the armored transport company. Washington told them that they "better get it open."[18]

Scheiwiller testified that Washington was wearing white tube socks on his hands. Martinez similarly testified that Washington had what appeared to be socks on his hands. Traut instead recalled the white tube socks being on the hands of the robber at the safe, but he did recall that robber wearing a cap which he believed was blue. Martinez testified that Washington was wearing a dark puffy jacket, like a down jacket.[19]

Scheiwiller and Traut both saw a third individual standing lookout during the robbery.[20]

After getting all of the money from the safe, the robbers left at a fast-paced walk, toward Wells Avenue. They left with approximately $500.00.[21]

Martinez testified that Washington and Nobles smelled of marijuana.[22]

As noted above, Martinez and Scheiwiller identified Washingon and Nobles at the hearing. An Auto Zone loss prevention officer had shown them individual photographs – *i.e.,*

---

[17]#26-3, Ex. 77, at 120 (Traut); #26-4, Ex. 77, at 121-23 & 129-30(same).

[18]#24-3, Ex. 37, at 14-18 (Martinez); #24-4, Ex. 37, at 38-40 (Scheiwiller).

[19]#24-3, Ex. 37, at 17 (Martinez); #24-3, Ex. 37, at 38-39 & 46 (Scheiwiller); #26-4, Ex. 77, at 124-26 (Traut).

[20]#24-4, Ex. 37, at 40-41 (Scheiwiller); #26-4, Ex. 77, at 135-36 (Traut).

[21]#24-3, Ex. 37, at 19-21 (Martinez); #24-4, Ex. 37, at 40, 42 & 44-46 (Scheiwiller); #26-4, Ex. 77, at 129-30 (Traut).

[22]#24-4, Ex. 37, at 32 (Martinez).

1    not in a photographic lineup array – of the arrested suspects a short time after the robbery.

2    They also saw the co-defendants at one or more prior settings of the preliminary hearing.

3    Martinez affirmed: "Yes, I remember them from the armed robbery."  Neither man was shown

4    a photographic lineup or other lineup by the police.[23]

5         Traut also acknowledged having been shown photographs of Washington, including

6    by the Auto Zone loss prevention officer and also by the prosecutor on the day before the

7    hearing.  He further saw the defendants at prior court settings.  He was very certain in his

8    identification, stating that "I have no problem identifying the individual at all."  He affirmed in

9    response to defense questioning that he recalled what he ate and what he wore that day, as

10   his memory of the day had not faded.[24]

11        On the morning of November 14, 2001, David Silva was driving on Wells Avenue in the

12   vicinity of the Auto Zone store.  He saw three males running down an alley with one carrying

13   a bag.  The situation looked suspicious to him, so he followed the males.  He saw them get

14   into a car and then execute an immediate and rapid U-turn.  Silva turned and followed the

15   vehicle, writing down the license plate number.  Silva followed the vehicle up to a light before

16   the freeway entrance, and he then turned around to head back.  When he approached the

17   Auto Zone, he saw the police, and he found out that there had been a robbery at the store.

18   Silva gave officers the license plate number along with a description of the vehicle and the

19   three males.[25]

20        A short time later, California Highway Patrol Officer Randy Fisher received a dispatch

21   with a description of a vehicle with three males and a full license plate number.  While on

22   patrol, he saw a vehicle with three males matching the description given to Nevada police by

23

24        [23]#24-4, Ex. 37, at 26-30 (Martinez); #24-4, Ex. 37, at 56-57 (Scheiwiller); #24-5, Ex. 37, at 58-59

25   (same).

26        [24]#26-4, Ex. 77, at 131-41 (Traut).

27        [25]#24-5, Ex. 37, at 63-74.  A detective who was not directly involved in the subsequent pursuit stated
     in other testimony that only a partial license plate number was obtained.  Silva testified that he wrote down the
28   license plate number, without clearly testifying that he wrote down only a partial number.  *Id.*, at 65 & 70-71.

1  Silva.  Officer Fisher came up behind the vehicle in his partially-marked vehicle, confirmed

2  the plate number, and called for fully-marked units to assist.[26]

3      When the marked units arrived and positioned themselves, the officers activated their

4  overhead lights.  The vehicle sped up to approximately 80 miles per hour for a distance before

5  pulling off and stopping in the right hand lane.  As the officers exited their vehicles drawing

6  their guns for a felony stop, the vehicle took off again at a high rate of speed.[27]

7       As the officers once again followed in pursuit, Officer Fisher saw three weapons being

8  thrown from the left rear window – a small semiautomatic handgun, a second semiautomatic

9  handgun, and a revolver.[28]

10     The pursuit lasted for approximately 30 minutes, with the suspect vehicle, *inter alia,*

11  driving at full speed through an agricultural checkpoint station, through numerous construction

12  zones, and through closed lanes.  Officer Fisher's vehicle, which was not the fastest of the

13  police vehicles in pursuit, showed a maximum reading of 117 miles per hour.  Officers

14  eventually were able to end the chase using a spike strip to deflate the vehicle's tires.[29]

15     When the vehicle stopped, the driver and the two other men attempted to run but were

16  quickly apprehended by officers.  Washington was the driver, and the two other males in the

17  vehicle were Nobles and Lewis.[30]

18     Officers conducting an inventory search of the vehicle found, *inter alia*, a plastic

19  shopping bag with loose change and change rolled in Peppermill coin wrappers, a bag with

20

21     [26]#24-5, Ex. 37, at 75-78 & 86-87.  Following upon the preceding note regarding the plate number,
22  Officer Fisher testified that he received a full plate number from dispatch.  If David Silva in fact provided
    authorities only a partial plate number with a vehicle description, it is possible that law enforcement authorities
23  matched up any such partial plate number with the vehicle description to produce a full plate number.  In all
    events, Officer Fisher testified that he received a full plate number from dispatch.

24     [27]#24-5, Ex. 37, at 78-80; #24-6, Ex. 37, at 88-89 & 92-94.

25     [28]#24-5, Ex. 37, at 80; #24-6, Ex. 37, at 90-91.

26
       [29]#24-5, Ex. 37, at 80-82; #24-6, Ex. 37, at 89-91.
27
       [30]#24-5, Ex. 37, at 82-84; #24-6, Ex. 37, at 91-92 & 95-96 (Officer Fisher); #26-5, Ex. 77, at 155-57
28  (Detective Myers).

an unopened package of sealant, a dark blue Yankees cap, a puffy dark-colored down-type jacket, white tube socks, .22 caliber ammunition, and a bag of apparent marijuana.  A very strong odor of marijuana emanated from the vehicle when it was opened.[31]

Dan Traut affirmed in his testimony that the adhesive or sealant, rolled change in Peppermill wrappers, and white tube socks recovered from the vehicle matched the corresponding items from the Auto Zone robbery.[32]

When the three men were booked into jail, two of the men each had $168.00 in cash and the other had $163.00, such that they had approximately $500.00 in currency and change.[33]

Three handguns also were recovered from the highway, including a .22 caliber handgun.  Two of the guns were recovered a short time after the men were apprehended, and the third was recovered after further searching the next day.[34]

Washington was charged in the Jack in the Box case of one count of robbery with the use of a firearm in connection with the robbery of the restaurant and one count of robbery with the use of a firearm in connection with the robbery of Michael Mello.[35]

He was charged in the Auto Zone case with robbery with the use of a firearm and conspiracy to commit robbery.[36]

The trial in the Auto Zone case ultimately was set for February 10, 2003.  The setting was a firm date with no remaining unresolved issues or other contingencies. #27, Ex. 87.

---

[31]#24-6, Ex. 37 at 102-11 (Detective Jenkins); #24-7, Ex. 37, at 125 (same); #26-4, Ex. 77, at 145-50 (Detective Myers); #26-5, Ex. 77, at 151-54, 157 (same).

[32]#26-4, Ex. 77, at 122, 127 & 130-21.

[33]#24-6, Ex. 37 at 110-11 (Detective Jenkins); #26-5, Ex. 77, at 157-58 (Detective Myers).

[34]#24-6, Ex. 37, at 115-17 (Detective Jenkins); #26-4, Ex. 77, at 145-50 (Detective Myers); #26-5, Ex. 77, at 152 (same); #26-6, Ex. 77, at 187-91 (Detective Chalmers); #26-7, Ex. 77, at 221-22 (same).

[35]#24-1, Ex. 19.

[36]#24, Ex. 4.

1    Three days prior to the trial setting in the Auto Zone case, on February 7, 2003,

2    Washington entered into a written guilty plea agreement in both cases.  He entered guilty

3    pleas in both cases in an on-the-record plea colloquy that same day.[37]

4    Washington pled guilty in the Jack in the Box case to one count of robbery with the use

5    of a firearm in connection with the Mello robbery, thereby reducing his maximum potential

6    sentencing exposure in that case by half.  He pled guilty in the Auto Zone case to robbery with

7    the use of a firearm and conspiracy to commit robbery.  Under the overall plea bargain, the

8    State agreed to not object to the sentence in the Jack in the Box case running concurrently

9    with the sentence in the Auto Zone case.[38]

10    The state court sentenced Washington in the Jack in the Box case to two consecutive

11    terms, with the weapon enhancement, of a maximum of 180 months with  eligibility for parole

12    consideration after a minimum of 72 months.  The court sentenced Washington in the Auto

13    Zone case, on the charge of robbery with the use of a firearm, also to two consecutive terms,

14    with the weapon enhancement, of a maximum of 180 months with eligibility for parole

15    consideration after a minimum of 72 months.  On the conspiracy charge, the court sentenced

16    Washington to a lesser term that ran concurrently with the robbery count.  The court ordered

17    that the Jack in the Box sentence run concurrent with the Auto Zone sentence.[39]

### Standard of Review

19    The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly

20    deferential standard for evaluating state-court rulings."  *Lindh v. Murphy*, 117 S.Ct. 2059,

21    2066 n.7(1997).  Under this deferential standard of review, a federal court may not grant

22    habeas relief merely on the basis that a state court decision was incorrect or erroneous.  *E.g.,*

23    *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003).  Instead, under 28 U.S.C. § 2254(d),

24    the federal court may grant habeas relief only if the decision: (1) was either contrary to or

26    [37]#27 & #27-1, Exhs. 90-92.

27    [38]#27-1, Exhs. 91-92.

28    [39]#27-3, Ex. 98, at 7-8.

-10-

1   involved an unreasonable application of clearly established law as determined by the United

2   States Supreme Court; or (2) was based on an unreasonable determination of the facts in

3   light of the evidence presented at the state court proceeding.  *E.g.*, *Mitchell v. Esparza*, 540

4   U.S. 12, 15, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003).

5        A state court decision is "contrary to" law clearly established by the Supreme Court only

6   if it applies a rule that contradicts the governing law set forth in Supreme Court case law or

7   if the decision confronts a set of facts that are materially indistinguishable from a Supreme

8   Court decision and nevertheless arrives at a different result.  *E.g., Mitchell,* 540 U.S. at 15-16,

9   124 S.Ct. at 10.  A state court decision is not contrary to established federal law merely

10  because it does not cite the Supreme Court's opinions.  *Id.*  Indeed, the Supreme Court has

11  held that a state court need not even be aware of its precedents, so long as neither the

12  reasoning nor the result of its decision contradicts them.  *Id.*  Moreover, "[a] federal court may

13  not overrule a state court for simply holding a view different from its own, when the precedent

14  from [the Supreme] Court is, at best, ambiguous."  *Mitchell*, 540 U.S. at 16, 124 S.Ct. at 11.

15  For, at bottom, a decision that does not conflict with the reasoning or holdings of Supreme

16  Court precedent is not contrary to clearly established federal law.

17       A state court decision constitutes an "unreasonable application" of clearly established

18  federal law only if it is demonstrated that the state court's application of Supreme Court

19  precedent to the facts of the case was not only incorrect but "objectively unreasonable."  *E.g.,*

20  *Mitchell*, 540 U.S. at 18, 124 S.Ct. at 12; *Davis v. Woodford*, 333 F.3d 982, 990 (9th Cir.

21  2003).

22       To the extent that the state court's factual findings are challenged intrinsically based

23  upon evidence in the state court record, the "unreasonable determination of fact" clause of

24  Section 2254(d)(2) controls on federal habeas review.  *E.g., Lambert v. Blodgett*, 393 F.3d

25  943, 972 (9th Cir. 2004).  This clause requires that the federal courts "must be particularly

26  deferential" to state court factual determinations.  *Id*.  The governing standard is not satisfied

27  by a showing merely that the state court finding was "clearly erroneous."  393 F.3d at 973.

28  Rather, the AEDPA requires substantially more deference:

1
2
3
4

> . . . . [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

5   *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

6   If the state court factual findings withstand intrinsic review under this deferential

7   standard, they then are clothed in a presumption of correctness under 28 U.S.C. § 2254(e)(1);

8   and they may be overturned based on new evidence offered for the first time in federal court,

9   if other procedural prerequisites are met, only on clear and convincing proof. 393 F.3d at 972.

10   The petitioner bears the burden of proving by a preponderance of the evidence that

11   he is entitled to habeas relief. *Davis*, 333 F.3d at 991.

12                                   ***Discussion***

13   **Ground 3: Effective Assistance of Counsel – Alibi Defense**

14   In the claims remaining before the Court in Ground 3, petitioner alleges that he was

15   denied effective assistance of counsel when defense counsel allegedly failed to investigate

16   an alibi defense prior to his plea in the two cases.

17   On state post-conviction review, the state district court appointed counsel for petitioner

18   and held an evidentiary hearing as to this claim.

19   ***Alleged Alibi for the Jack in the Box Robberies***

20   Petitioner presented testimony by Carolyn Franklin and Jimmy Brooks in regarding to

21   an alibi defense to the robberies at the Jack in the Box on the morning of November 4, 2001.

22   Carolyn Franklin was a longstanding girlfriend of Washington's, and they had two

23   children together. They lived in Sacramento, California. According to Franklin's testimony,

24   Washington slept in on the Sunday morning of November 4, 2001. She testified that

25   Washington did not leave the house until 11:00 a.m. or 12:00 noon when he took the children

26   over to his mother's house where he was planning to watch football. She testified that she

27   remembered where Washington was that particular Sunday because she was excited that she

28   would be getting some time alone. On cross-examination, she acknowledged, however, that

1   this was not an uncommon occurrence.  She then maintained on redirect that the Sunday

2   stood out because it was the last Sunday that it was just Washington with the children prior

3   to his being arrested.[40]

4       According to Franklin's testimony, when she heard that Washington had been arrested

5   in Reno on November 14, 2001, she did not know that he was being charged also with the

6   earlier robberies on November 4, 2001.  Franklin testified, when she initially was on the stand,

7   that she never was contacted by anyone to see if she would be willing to testify on

8   Washington's behalf.  She specifically denied that Washington's retained counsel, Bruce

9   Lindsay, had ever called her on the phone.  She asserted when she initially was on the stand

10  that she did not learn of the significance of the November 4, 2001, date until after Washington

11  was in state prison, after sentencing, although she visited him while he was in county jail prior

12  to sentencing.[41]

13      According to Franklin, when she was approached by an investigator from the district

14  attorney's office in advance of the evidentiary hearing, she was frightened.  She maintained

15  that there had been a prior incident where she had been chased a week earlier.  She was

16  asked on cross-examination as to whether she told the investigator that Washington had left

17  early in the day on November 4, 2001.  She responded: "I was shaking, so I can't say for sure

18  if that's exactly what I said."  She acknowledged on cross-examination that she did not see

19  Washington again on November 4, 2001, until "much later that evening."[42]

20      Jimmy Brooks is one of Washington's brothers.  He testified that Washington came

21  over to their mother's house with the children shortly before 1:00 p.m. on November 4, 2001,

22  to watch a football game on their mother's cable television.  Their mother was not present.

23  Brooks testified that he did not learn of the significance of the November 4, 2001, date until

24

---

25       [40]#29-7, Ex. 222, at 6-13, 22-23, 25 & 27-28.  Sacramento is approximately a two-hour drive from

26   Reno.

27       [41]#29-7, Ex. 222, at 11-12, 16, 21-22 & 24.

28       [42]*Id.*, at 16-18, 21 & 25-26.

"later," but he could not identify how much later.  Brooks later also vaguely testified (*i.e.*, testifying "I think") on cross-examination that he did not learn of the significance of the date until after Washington already had been convicted.  However, he also vaguely recalled being called in 2001 or 2002, prior to trial, by someone asking about the alleged alibi.[43]

Washington's retained trial counsel, Bruce Lindsay, testified as follows.  Washington told him that there was a female who could establish that he was not in Reno on the date of the Jack in the Box robberies.  Lindsay did not recall being given the names of any male alibi witnesses.  Lindsay recalled at the time of the hearing that the female was a relative, perhaps a cousin or a sister, but he could not rule out that it was a girlfriend.  It took several telephone calls for Lindsay to reach the individual.  When he did, the potential witness was vague as to the details supporting an alibi defense.  Lindsay testified that he had had difficulty reaching and communicating with Washington's family members.  He testified that it appeared to him that they thought he was calling to obtain money for the representation rather than to obtain information for the case.[44]

Lindsay further testified that Washington informed him that he wished to plead guilty before Lindsay completed his investigation of a possible alibi defense for the Jack in the Box robberies.  Lindsay testified that if Washington instead had decided to go to trial in that case, Lindsay would have interviewed the possible alibi witness further.  He would have sought to determine whether she could provide more useful specific testimony than the vague statements in the initial interview.  Lindsay testified that he kept Washington apprised of his investigation of the alibi defense.[45]

The prosecutor from the criminal cases, Katherine Lyon, testified as follows.  Her office faxed  draft guilty plea memoranda in the two cases -- which were introduced in evidence at the post-conviction evidentiary hearing – to Washington's counsel on December 12, 2002,

[43]#29-7, Ex. 222, at 28-33; #29-8, Ex. 222, at 36-46.

[44]#29-9, Ex. 222, at 69-75 & 83-91.

[45]*Id.*, at 85-88 & 91.

approximately two months before the February 10, 2003, scheduled trial date in the Auto Zone case.  She testified that she would have faxed plea memoranda to defense counsel based upon counsel advising her that the defendant was going to change his plea.[46]

Before Lindsay testified, two witnesses, including Carolyn Franklin, were allowed to stay in the courtroom based upon petitioner's counsel's representation that she did not plan to call the witnesses again.  Subsequent to Lindsay's testimony, but with no objection from the State, petitioner recalled Franklin to the stand.  She testified that approximately a month-and-a-half after the arrest, Washington's mother told her that he was going to court and that Franklin should call his attorney.  She testified that when she called the attorney -- again, at a point only approximately six weeks after the arrest -- he told her that she did not need to be at court.  She maintained that this call was the only contact that she had with defense counsel.[47]

The investigator for the district attorney's office, John Gurriere, testified as follows.  Gurriere and his partner walked up to Franklin in a parking lot while she was getting into her car, and he displayed his badge.  He testified that she was surprised and a little nervous but not shocked or startled.  Franklin made a phone call to petitioner's post-conviction counsel, and Gurriere clearly heard her say to counsel that someone with the district attorney's office was there to talk to her.  Franklin gave no indication to Gurriere that she thought that he and his partner were street criminals.[48]

After Franklin completed the call to counsel, Gurriere asked her questions concerning Washington's alibi defense.  Franklin could not give Gurriere a specific time as to when Washington left the house on November 4, 2001.  She said only that he left "early in the day." She could not recall details about the day, such as the weather or what Washington was wearing. #29-11, Ex. 224, at 75-77.

---

[46]#29-11, Ex. 224, at 79-85; see also #29-12, Ex. 224, at 90.

[47]#29-8, Ex. 222, at 64; #29-10, Ex. 222, at 108-11.

[48]#29-11, Ex. 224, at 72-79.

1    The State called Washington on cross-examination at the state post-conviction

2    hearing.  Washington did not provide any testimony – on questioning by either counsel – vis-

3    à-vis providing defense counsel information regarding an alibi defense.  He testified that he

4    informed Franklin while he was in county jail "that my lawyer would be calling her," but he

5    could not recall talking with her specifically about providing alibi testimony as to November

6    4, 2001.

7              ***Alleged Alibi for the Auto Zone Robbery***

8              Multiple witnesses for petitioner acknowledged that Washington was in Reno on

9    November 13 and 14, 2001, when the Auto Zone robbery occurred.[49]  Washington of course

10   was apprehended a short distance across the border in California after first driving and then

11   running from a car that had been seen at the scene of the robbery in Reno only a short time

12   before.

13             The only witness that petitioner presented who provided testimony that Washington,

14   while in Reno, was not at the Auto Zone at the time of the robbery was his former co-

15   defendant, Kevin Lewis.  He had entered a guilty plea in the Auto Zone case.

16             According to Lewis, he borrowed Washington's rental car from him on the evening of

17   November 13, 2001.  Lewis testified that he and Nobles then took the vehicle to go clubbing

18   and did not see Washington the rest of that evening.  The next morning, on November 14,

19   2001, Lewis recalled being parked in an alley while Nobles and Norwood "Scooby" Armstrong,

20   from a different vehicle, left for several minutes.  Lewis – who had pled guilty to the Auto Zone

21   robbery – testified that he was in too much of a daze from being high on PCP to move from

22   the car.  He maintained that he did not know where the Auto Zone was, and he did not have

23   any recollection of a robbery.  According to Lewis, they picked up Washington from his hotel

24   a short time later and left for Sacramento.  He attributed the subsequent high speed chase

25   to Washington becoming paranoid when Lewis told him – after Washington first pulled over,

26

27        _____

28        [49]#29-7, Ex. 222, at 10-11 (Carolyn Franklin); #29-8, Ex. 222, at 48-49 (Pamela Brooks); #29-10, Ex.
     222, at 96 (Ahsan Washington); #29-11, Ex. 224, at 10-19 & 36-48 (Kevin Lewis).

-16-

1   and thus after he had accelerated the first time – that he had a pound of marijuana in the car.

2   Lewis had no explanation for how the materials from the Auto Zone robbery ended up in the

3   car.[50]

4       Notably, Lewis testified that he did not tell his attorney that Washington allegedly was

5   not involved in the Auto Zone robbery.  He maintained that he did not do so at the time

6   because Armstrong still was a free man.  Lewis asserted that he was testifying about it at the

7   post-conviction hearing because Armstrong had become incarcerated in the meantime.[51]

8       Petitioner also called his other co-defendant, Anthony Nobles, to testify at the state

9   post-conviction hearing.  Nobles, however, invoked the Fifth Amendment.[52]

10      Washington's trial counsel, Bruce Lindsay, testified that he did not remember

11  Washington stating that he had any alibi witnesses for the Auto Zone case.[53]

12      Petitioner did not present any contrary testimony by any witness – including by

13  Washington himself when he was on the stand – that Washington or anyone else told Lindsay

14  that he had an alibi witness for the Auto Zone case.  Lewis, the only alleged Auto Zone alibi

15  witness who testified at the post-conviction hearing, testified, again, that he did not even tell

16  his own attorney about the alleged alibi, such that there was no evidence that the alleged

17  information was relayed to Washington's counsel.

18      ***State Court Findings and Holdings***

19      The state district court, in its written findings, conclusions, and judgment, found, *inter*

20  *alia*: (1) that Washington's trial counsel, Bruce Lindsay, testified credibly that Washington did

21  not mention an alibi for the Auto Zone robbery; (2) that Lindsay testified credibly that

22  Washington claimed that he had an alibi for the Jack in the Box robberies and provided the

23  name of a female potential witness; (3) that Lindsay ultimately talked to the potential witness

---

25  [50]#29-11, Ex. 224, at 9-19 & 27-54.

26  [51]#29-11, Ex. 224, at 13-14 & 16-17.

27  [52]#29-11, Ex. 224, at 55-63.

28  [53]#29-9, Ex. 222, at 70.

1    but that she did not clearly exculpate Washington; (4) that Lindsay testified credibly that he

2    had not completed his investigation when Washington informed him that he wished to accept

3    a plea deal; and (5) that the decision to plead, and thus Lindsay's decision to forego further

4    investigation, occurred well before the plea was actually entered, given the prosecutor's

5    custom of sending a plea memorandum only after being informed that the defendant had

6    decided to accept a plea bargain.[54]

7         In the last reasoned decision on this claim on the post-conviction appeal, the Supreme

8    Court of Nevada rejected the claim presented to that court on the following grounds:

9
10                . . . Washington contends that that [sic] the district court
          erred by denying the petition because defense counsel was
11        ineffective for failing to investigate alibi witnesses. Specifically,
          Washington contends that the district court erred by finding
12        defense counsel's testimony more credible than Washington's
          because it "contain[ed] a plethora of contradictions." Additionally,
13        Washington contends that defense counsel's investigation was
          deficient because he stopped his investigation after Washington
14        expressed an interest in pleading guilty, even though the plea
          agreement was not actually signed until months later just before
15        trial. The district court found that defense counsel conducted a
          reasonable investigation of the cases. We conclude that the
16        district court's finding is supported by substantial evidence.

17                At the post-conviction hearing, defense counsel testified
          about his investigation in the case. Specifically, defense counsel
18        Robert Bruce Lindsay testified that he reviewed the preliminary
          hearing testimony and discussed the cases numerous times with
19        Washington. Defense counsel explained that Washington
          provided him with the name and telephone number of an alibi
20        witness for only one of the two robberies, and he spoke with her
          but she "was sort of vague about [the specifics of the alibi]."

21                Additionally, defense counsel testified that he stopped his
          investigation into Washington's alibis, even though it was not
22        complete, after Washington told him he was going to accept a

23

24        [54]#30-2, Ex. 245, at 2-5. The state district court further found in its written findings, conclusions, and
     judgment: (a) that Lindsay had no cause to investigate an alleged alibi for the Auto Zone case because
25   Washington allegedly did not deny his involvement in that crime; (b) that further pre-plea investigation would
     not have led to the testimony that Carolyn Franklin ultimately presented in the post-conviction hearing, even if
26   she was the witness that Washington identified prior to the trial; (c) that Washington's decision to enter a plea
     was based upon a conversation with his mother about her possibly dying while he still was in prison rather
27   than any performance or advice of counsel; (d) that Carolyn Franklin's alibi testimony was not credible and
     would not have been believed by reasonable jurors; and (e) that Kevin Lewis' alibi testimony was "entirely
28   incredible and unworthy of belief." See also #29-12, at 133-41 (oral findings and reasons).

plea offer. Defense counsel explained that, despite Washington's significant criminal history, the State had agreed to recommend that the sentences imposed in the two cases run concurrently. Further, defense counsel summarized the State's evidence against Washington, noting that there was a solid eyewitness identification in the first robbery case, and Washington and his codefendants were caught, after a high-speed police pursuit, fleeing the scene of the second robbery with evidence of the crime inside the vehicle.

Although, at the post-conviction hearing, Washington presented testimony from his potential alibi witnesses and testified that he had provided defense counsel with their names before trial, the district court found that Washington and his alibi witnesses were not credible. In rejecting Washington's claim, the district court noted that Washington had previously admitted to his involvement in the robberies at the plea canvass and in a written statement attached to the presentence investigation report. Additionally, the district court also noted that the testimony of the alibi witnesses was either equivocal on the issue of Washington's whereabouts during the times of the robberies or was inconsistent with prior statements and wholly incredible. Accordingly, the district court did not abuse its discretion by finding that defense counsel conducted an adequate investigation of the alibi witnesses.

#30-7, Ex. 278, at 2-4 (citation footnote omitted).

### *Analysis*

The Supreme Court decisions in *Tollett v. Henderson*, 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973), and *Hill v. Lockhart*, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985), sharply curtail the possible grounds available for challenging a conviction entered following a guilty plea. As the Court stated in *Tollett*:

> . . . . [A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the [constitutional] standards [established for effective assistance of counsel.]

411 U.S. at 267, 93 S.Ct. at 1608. Accordingly, "while claims of prior constitutional deprivation may play a part in evaluating the advice rendered by counsel, they are not themselves independent grounds for federal collateral relief." *Id.*

In *Hill*, the Court held that the two-pronged test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), applies to challenges to guilty pleas based on alleged ineffective assistance of counsel.  474 U.S. at 58, 106 S.Ct. at 370.  Accordingly, a petitioner seeking to set aside a guilty plea due to ineffective assistance of counsel must demonstrate: (1) that his counsel's performance fell below an objective standard of reasonableness; and (2) that the defective performance resulted in actual prejudice.  474 U.S. at 58-59, 106 S.Ct. at 370.

On the performance prong, the question is not what counsel might have done differently but rather is whether counsel's decisions were reasonable from counsel's perspective at the time.  In this regard, the reviewing court starts from a strong presumption that counsel's conduct fell within the wide range of reasonable conduct.  *E.g., Beardslee v. Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

On the prejudice prong, as a general matter under *Strickland*, the petitioner must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *E.g., Beardslee*, 327 F.3d at 807-08.  Application of this general principle to the specific context of a guilty plea leads to the requirement that the petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  *Hill*, 474 U.S. at 59, 106 S.Ct. at 370.

Under *Hill*, a challenge to the voluntariness of a guilty plea potentially may be based upon a claim of ineffective of assistance of counsel in proceedings prior to the plea.  As the Court observed:

> . . . . For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea.   This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial.   Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the

1
2
3
4

crime charged, the resolution of the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial. . . . . As we explained in *Strickland v. Washington, supra*, these predictions of the outcome at a possible trial, where necessary, should be made objectively, without regard for the "idiosyncrasies of the particular decisionmaker." Id., 466 U.S., at 695, 104 S.Ct., at 2068.

5   474 U.S. at 59-60, 106 S.Ct. at 370-71.  Thus, an attorney's unprofessional error in failing to

6   develop a meritorious defense may serve as a basis for overturning a guilty plea and

7   conviction if, viewed objectively, there is a reasonable probability that, but for the error, the

8   petitioner would not have pled guilty and would have insisted on going to trial.

9           As to the two judgments of conviction challenged here, the state supreme court's

10  rejection of Washington's claim was neither contrary to nor an unreasonable application of

11  the foregoing United States Supreme Court authorities.

12          In the Auto Zone case, the state court factual finding that Washington did not tell his

13  trial counsel about any alleged alibi for the Auto Zone robbery was amply supported by the

14  record.  Petitioner presented no testimony at the evidentiary hearing that he told Lindsay

15  about an alibi for the Auto Zone robbery.  Indeed, the alleged alibi witness that Washington

16  did present on post-conviction review, co-defendant Kevin Lewis, clearly testified that he did

17  not tell even his own counsel about the account that he gave at the post-conviction hearing.

18  Washington's counsel plainly could not be found to have rendered deficient performance for

19  failing to pursue an alleged alibi defense that was not revealed until years after the plea.

20          Moreover, viewed objectively, there was not a reasonable probability that a defendant

21  in Washington's situation at the time of his February 7, 2003, plea would have not pled guilty

22  and instead would have insisted on going to trial in reliance upon an alibi defense based upon

23  Lewis' testimony.  At the very outset, it would have been subject to substantial question

24  whether Lewis – a co-defendant in the same case[55] – even would have been available to

25  testify on Washington's behalf at trial, as Lewis had a constitutional right to not take the stand.

26  In any event, even in a scenario where, *arguendo*, Lewis took the stand at trial and gave the

27  _____

28  [55]Lewis did not change his plea in the Auto Zone case until three days after Washington's plea, when the case came on for trial.  #27-1, Exhs. 93 & 95.

account that he did years later at the post-conviction hearing, there was not a reasonable probability that a jury would give credence to such a story told by a co-defendant in the same case in the face of the State's strong evidence of the guilt of both men in the Auto Zone case. Anything perhaps may be possible, but there was not a reasonable probability that such testimony by a co-defendant would carry the day at trial as against the strong evidence of guilt in the Auto Zone case. Petitioner therefore could not establish resulting prejudice even if he could demonstrate deficient performance by counsel as to the Auto Zone conviction.

In the Jack in the Box case, given the state court factual findings, petitioner also cannot demonstrate either deficient performance by counsel or resulting prejudice.

Under the well-supported state court factual findings, Washington's counsel spoke to the female alibi witness that Washington identified, but counsel initially was not sanguine that the potential alibi testimony was sufficiently specific. He intended to pursue the investigation of the alibi defense further, however, up until the point that Washington decided in December 2002 instead to change his plea.

Petitioner's state post-conviction counsel urged that petitioner was left with no choice except to follow through with the earlier decision to change his plea when he finally went through with the proposed plea deal on February 7, 2003, only three days prior to trial. Under petitioner's argument, he had no choice at that point because there was not sufficient time left for defense counsel to investigate, develop and raise the alibi defense only three days before trial. As the argument went, petitioner had to enter the plea because counsel had done nothing in the case to pursue the alibi defense.

This argument misses the mark, by a wide margin. The February 10, 2003, trial setting was for *the Auto Zone case*, as to which Washington had not identified an alibi witness, not for the Jack in the Box case. The Jack in the Box case was not coming to trial until several months later.[56] If Washington wanted to insist on going to trial in reliance upon an alibi defense in the Jack in the Box case, all that he had to do was to tell his counsel that he had

---

[56]See,e.g., #27, Ex. 87, at 5-7; see also #26-9, Ex. 83, at 4-5.

1   changed his mind regarding a plea deal such that counsel could resume the investigation.

2   There was ample time left for defense counsel to investigate, develop and raise an alibi

3   defense in the Jack in the Box case.  Washington's hand thus clearly was not forced by

4   defense counsel suspending further investigation of an alibi as to the Jack in the Box case

5   after petitioner indicated that he wanted to accept a plea deal in December 2002.

6          The state court conclusions that counsel did not render deficient performance by not

7   pursuing the investigation further prior to the plea and that petitioner was not prejudiced

8   thereby were neither contrary to nor an unreasonable application of clearly established federal

9   law.[57]

10         The claims remaining before the Court in Ground 3 therefore do not provide a basis

11   for federal habeas relief.

12         **_Ground 11: Effective Assistance of Counsel – Mitigation Evidence_**

13         In the claims remaining before the Court in Ground 11, petitioner alleges that he was

14   denied effective assistance of counsel when defense counsel failed to present additional

15   mitigating evidence at sentencing.

16         Washington's plea deal and the sentence imposed by the state district court are

17   summarized, _supra_, at 10.

18         Washington acknowledged in the plea agreements collectively that his prior criminal

19   history included numerous felony convictions.   The state district court at sentencing

20   characterized petitioner's prior criminal history as "a very significant criminal history," and the

21   court stated that it was "unfortunate that you have committed your life to such horrific criminal

22   activity."[58]

23         / / / /

24

25         [57]The Court additionally notes – in connection with an objective assessment of the situation facing a
26   defendant considering whether to enter a plea or instead to go to trial – that the success of an alibi defense
     based upon testimony by a girlfriend and/or a family member is hinged wholly upon a jury's view of the
27   credibility of witnesses with a natural desire to help the defendant.

28         [58]#27-1, Exhs. 91 & 92; #27-3, Ex. 98, at 7.

1    The Division of Parole and Probation recommended the sentences that ultimately were

2    imposed by the state district court, with the exception that the Division recommended that the

3    sentences in the one case be imposed consecutively to those in the other case.  The State,

4    consistent with the plea deal, did not object to the sentence in the Jack in the Box case

5    running concurrently with the sentences in the Auto Zone case.  Defense counsel argued for

6    such concurrent sentencing consistent with the negotiation.[59]

7    The state district court, after noting Washington's prior criminal history and the violent

8    and dangerous crimes involved, followed the negotiations.  The court ordered that the Jack

9    in the Box sentence run concurrent with the Auto Zone sentences.[60]

10   At the post-conviction hearing, petitioner presented testimony from Washington's

11   girlfriend and several family members as to his alleged significant and positive influence in

12   their lives.  The family members generally testified that they were willing to so testify at the

13   sentencing but they were not contacted by defense counsel.[61]

14   On the post-conviction appeal from the district court's denial of the claim, the Supreme

15   Court of Nevada rejected the claim presented to that court on the following grounds:

16   . . . Washington contends that the district court erred by
     denying his petition because defense counsel was ineffective for

17   failing to present mitigating evidence at sentencing.  In particular,
     Washington argues that defense counsel should have presented

18   testimony from Washington's family members describing his good
     moral character.  After hearing testimony from the character

19   witnesses, the district court found that the additional mitigating
     evidence would not have resulted in a lesser sentence.  At the

20   post-conviction hearing, the district court explained that it had
     previously ordered the sentences to run concurrently "with great

21   reluctance," based in part on defense counsel's argument about
     mitigating factors, as well as the recommendation of the

22   prosecutor made pursuant to the plea bargain.  The district court

23   _____

24   [59]#27-3, Ex. 98, at 3-6.

25   [60]*Id.*, at 6-9.

26   [61]#29-7, Ex. 222, at 13-16 (Carolyn Franklin); #29-7, Ex. 222, at 33-34 (Jimmy Brooks); #29-8, Ex.
     222, at 35-36 (same); #29-8, Ex. 222, at 52-58 (Pamela Brooks); #29-9, Ex. 222, 92-94 (Ahsan Washington);

27   #29-10, Ex. 222, at 95-96 (same); #29-10, Ex. 222, at 97-108 (Devorah Carter).  Washington's mother,
     however, testified that she spoke with Washington about the sentencing and that he told her not to come

28   because she needed to work to make a living. #29-8, Ex. 222, at 61-62.

1  commented that Washington's criminal history did not warrant a
2  concurrent sentence, and that the Division of Parole and
   Probation had recommended consecutive sentences. Under the
3  circumstances, Washington has failed to show that the district
   court abused its discretion by finding that testimony from family
4  members about his good moral character would not have resulted
   in a lesser sentence.

5  #30-7, Ex. 278, at 4-5.

6  The state courts' rejection of this ineffective assistance claim was neither contrary to

7  nor an unreasonable application of clearly established federal law. As the Ninth Circuit has

8  noted, "the Supreme Court has not delineated a standard which should apply to ineffective

9  assistance of counsel claims in noncapital sentencing cases [such that] ... there is no clearly

10 established federal law as determined by the Supreme Court in this context." *Davis v. Grigas*,

11 443 F.3d 1155, 1158 (9th Cir.2006)(internal citation omitted). Because there is no clearly

12 established Supreme Court precedent that applies in this noncapital sentencing context,

13 petitioner cannot establish that the state courts' rejection of his claim was either contrary to

14 or an unreasonable application of clearly established federal law as determined by the United

15 States Supreme Court. *Id.* Moreover, the state courts' determination that there was not a

16 reasonable probability that the outcome of the sentencing proceeding would have been

17 different was not objectively unreasonable. Nor was the state courts' rejection of the claim

18 based upon an unreasonable determination of fact.

19 The claims remaining before the Court in Ground 11 therefore do not provide a basis

20 for federal habeas relief.

21 ***Consideration of Possible Issuance of a Certificate of Appealability***

22 Under new Rule 11 of the Rules Governing Section 2254 Cases, the district court must

23 issue or deny a certificate of appealability (COA) when it enters a final order adverse to the

24 applicant. A timely notice of appeal must be filed even if the district court issues a certificate

25 of appealability. A motion to reconsider a denial does not extend the time to appeal.

26 As to the claims rejected by the district court on the merits, under 28 U.S.C. § 2253(c),

27 the petitioner must make a "substantial showing of the denial of a constitutional right" in order

28 to obtain a COA. *Slack v. McDaniel*, 529 U.S. 473, 483-84, 120 S.Ct. 1595, 1603-04, 146

-25-

L.Ed.2d 542 (2000); *Hiivala v. Wood*, 195 F.3d 1098, 1104 (9th Cir. 1999).  To satisfy this standard, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong."  *Slack*, 529 U.S. at 484, 120 S.Ct. at 1604.

Jurists of reason would not find debatable or wrong this Court's conclusion that the state supreme court's rejection of the remaining Ground 3 claims was neither contrary to nor an unreasonable application of clearly established federal law.  At bottom, petitioner did not present any evidence that defense counsel ever was informed of a potential alibi in the Auto Zone case.  Defense counsel further acted reasonably in suspending further investigation of an alibi defense in the Jack in the Box case after Washington advised the he intended to accept a plea bargain.  The fact that Washington did not formally enter into the plea deal until three days before trial did not force Washington's hand in any respect.  The trial in question was in the Auto Zone case, as to which Washington had not advised counsel of an alibi; and counsel had ample time to investigate an alibi defense for the later Jack in the Box trial if Washington changed his mind.  Jurists of reason therefore would not find the denial of this claim debatable or wrong.  See discussion, *supra*, at 1-10 & 12-23.

Jurists of reason also would not find debatable or wrong this Court's conclusion that the state supreme court's rejection of the remaining Ground 11 claims was neither contrary to nor an unreasonable application of clearly established federal law.  No clearly established Supreme Court law delineates a standard applicable to claims of ineffective assistance of counsel vis-à-vis noncapital sentencing.  The state courts' determination that there was not a reasonable probability that the outcome of the sentencing proceeding would have been different in any event was neither objectively unreasonable nor based upon an unreasonable determination of fact.  Jurists of reason therefore would not find the denial of this claim debatable or wrong.  See discussion, *supra*, at 23-25.

IT THEREFORE IS ORDERED, as to the claims remaining before the Court, that the petition for a writ of habeas corpus shall be DENIED on the merits and that this action shall be DISMISSED with prejudice.

1      IT FURTHER IS ORDERED that a certificate of appealability is DENIED.

2      The Clerk of Court shall enter final judgment accordingly in favor of respondents and

3 against petitioner, dismissing this action with prejudice.

4      DATED: February 16, 2010

5

6

7                     _____

8                     EDWARD C. REED
                        United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-27-